**Ex parte Robert James TENNARD.**

**No. 71678.**

Court of Criminal Appeals of Texas,
En Banc.

Dec. 18, 1997.

**58**

Elizabeth Cohen, Austin, for appellant.

Kari Sckerl, Asst. Dist. Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

McCORMICK, Presiding Judge.

This is a post conviction application for writ of habeas corpus filed pursuant to Article 11.07, V.A.C.C.P. We will deny relief.

In October 1986, a jury convicted applicant of capital murder, and sentenced him to die. This Court affirmed applicant's conviction and sentence on direct appeal. *Tennard v. State,* 802 S.W.2d 678 (Tex.Cr.App.1990). The United States Supreme Court denied applicant's petition for writ of certiorari on June 28, 1991. *Tennard v. Texas,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991).

In this proceeding, applicant claims the Texas capital sentencing scheme applicable to his case [1] was applied to him in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He argues the special issues failed to provide his jury a vehicle to give mitigating effect to "relevant mitigating evidence" of his youth, "youthful incarceration" and what he claims is evidence of his mental retardation, all in violation of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

Viewed in the light most favorable to the verdict, the evidence shows applicant and two others brutally murdered two men in their home during a robbery. See *Tennard,* 802 S.W.2d at 679. Applicant lived behind the home of the victims, and he knew them. The victims had invited applicant and his two friends into their home approximately fifteen to thirty minutes before they were attacked. Applicant stabbed one of the victims fifteen times with a knife while one of applicant's friends killed the other victim with a hatchet. Applicant played a dominant role in disposing of the victims' stolen property. Applicant presented an alibi defense, and he presented other evidence from which the jury might have concluded that another person possibly could have committed the murders.

The evidence from the punishment hearing shows applicant had been on parole from a felony rape conviction for about three and one-half months when he committed this offense. The rape victim testified applicant and two others forced her into a car while she was at a bus stop. Just after she was forced into the car, applicant, who was displaying about a foot-and-a-half-long pipe-wrench, said to her, "[M]ove, white bitch, and you're dead."

The victim testified applicant and his friends took her to an abandoned apartment at some government project where applicant forced her to engage in oral, vaginal and anal sex with him. After that, applicant's two friends took turns sexually assaulting her.

Applicant and his friends then took the victim to another house where applicant began using drugs and discussing "pimping out" the victim. She asked applicant if she could go to the bathroom to take a bath, which he allowed her to do:

"Q. Now you told them that you wanted to take a bath?

"A. Yes, I did.

"Q. Did [applicant] say anything?

"A. He told me I wasn't going to try to run away, was I.

"Q. What did you tell him?

"A. I told him, 'No, baby. I like you. I wouldn't do that.'"

---

1. See Article 37.071(b)(1) and (2), V.A.C.C.P., (requiring the submission of two special issues to the jury: (1) "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" and (2) "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society").

After applicant let the victim go to the bathroom, she escaped through a window, and applicant was arrested later that day. The victim testified applicant appeared to be the leader during her ordeal. Applicant impeached the victim's testimony with a prior statement she made from which the jury could have inferred one of applicant's friends was the leader.

Applicant's parole officer testified that a Texas Department of Correction's (TDC) record from applicant's incarceration for the rape conviction indicated he had a 67 IQ.

"Q. ... And did you in fact bring a documentation of what [applicant's] intelligence quotient is according to the test from the penitentiary?

"A. Yes, I did.

"Q. And what was the result of the test?

"A. It's a 67, sir."

During cross-examination of this witness, the State introduced the TDC record into evidence. This record appears to have been prepared approximately five years before applicant committed this offense, and there is a notation on the record indicating applicant had an IQ of 67. However, the witness could not say who prepared the report, or conducted the IQ test.

"Q. Mr. Kinard, this doesn't purport to be any report by any particular psychologist or anything, does it?

"A. No, sir.

"Q. It's basically just sort of, as its says, social and criminal history of [applicant]?

"A. Right, sir.

"Q. And it says, there's basically a line for IQ, and it says 67?

"A. That's correct.

"Q. And it has no indication of who may have given those tests or under what conditions?

"A. No sir, it doesn't."

This is *all* the evidence presented at applicant's 1986 trial on his "mental retardation." The term "mental retardation" is not mentioned anywhere in this record. Applicant also introduced evidence showing he was twenty-two years of age when he committed

this offense, and he had spent most of his formative years incarcerated.

During closing arguments at the punishment phase, the prosecutor argued the facts of the crime itself showed applicant's "special dedication to violence."

"Look at the facts of the crime itself. You know pulling a pistol or pulling a trigger on a pistol is a fairly easy way to kill someone. Not easy, but it's a detached way. It takes a special dedication to violence to plunge a knife into a human body sixteen times."

Applicant referred to the IQ evidence twice during closing arguments at punishment. He referred to the evidence in responding to portions of the rape victim's testimony:

"... the information that they gave is that [appellant] has got a 67 IQ. The same guy that told this poor unfortunate woman that was trying to work that day, 'Well, if I let you in there, will you leave?' And he believed her. This guy with the 67 IQ, and she goes in and, sure enough, she escapes, just like she should have. That is uncontroverted testimony before you, that we have got a man before us that has got an intelligence quotient before us that is that low."

And, he asked the jury to take into account the IQ evidence in answering the special issues:

"... none of you are suffering from a 67 IQ. So you're going to have to try to judge this man and decide what his punishment would be as his peers."

### Evidence of Youth and Previous Incarceration

■ Applicant argues the special issues failed to provide the jury a vehicle to give mitigating effect to evidence of his youth and evidence that he spent most of his formative years incarcerated. We disagree.

This Court and the United States Supreme Court have held the special issues allow the fact finder to give mitigating effect to evidence of a defendant's youth and good prison record. See *Johnson v. Texas*, 509 U.S. 350,

367–69, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993); *Jones v. State,* 843 S.W.2d 487, 497 (Tex.Cr.App.1992), *cert.denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Ex parte Harris,* 825 S.W.2d 120, 122 (Tex. Cr.App.1991). And, we have held the special issues allow the fact finder to consider and give mitigating effect to evidence of a troubled or abusive childhood. *See Ex parte Jacobs,* 843 S.W.2d 517, 520 (Tex.Cr.App. 1992); *Goss v. State,* 826 S.W.2d 162, 166 (Tex.Cr.App.1992); *Lewis v. State,* 815 S.W.2d 560, 567 (Tex.Cr.App.1991).

Since the special issues allow the fact finder to give mitigating effect to this kind of evidence, they also allow the fact finder to consider and give mitigating effect to any mitigating qualities of evidence of "youthful incarceration." In any event, applicant has not established any "nexus" between his "youthful incarceration" and the "circumstances of the offense which tend[s] to excuse or explain the commission of this offense." *See,* e.g., *Earhart v. State,* 877 S.W.2d 759, 765 (Tex.Cr.App.1994), *cert. denied,* 513 U.S. 966, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994). And, the proposition that evidence of "youthful incarceration" possesses any mitigating qualities is almost absurd. We hold the special issues provided the jury a vehicle to give effect to any mitigating qualities of the evidence of applicant's youth and "youthful incarceration."

### Mental Retardation

■ Applicant also claims the special issues failed to provide the jury a vehicle to give mitigating effect to evidence of his "mental retardation." He claims this Court should "reaffirm its bright-line rule" that " 'evidence of mental retardation falls beyond the scope of the [former] statutory special issues.' " *See,* e.g., *Earhart,* 877 S.W.2d at 765. The first question we must ask is whether there is any evidence that applicant is mentally retarded. Applicant would have this Court hold under *Penry* that a five-year-old reference in an obscure TDC record to applicant's IQ score of 67 shows applicant is mentally retarded, and that evidence of an IQ of 70 or less is sufficient evidence to support a finding of mental retardation. We decline to do so.

According to the American Association on Mental Retardation (AAMR), a person is considered to be mentally retarded *only* when there is evidence of: (1) subaverage general intellectual functioning, (2) concurrent deficits in adaptive behavior, *and* (3) onset during the early development period. See David L. Rumley, Comment: *A License to Kill: The Categorical Exemption of the Mentally Retarded from the Death Penalty,* 24 St. Mary's Law Journal Number 4 1299, 1312–14 (1993). Texas has adopted the AAMR three-part definition of mental retardation in the "Persons With Mental Retardation Act." See V.T.C.A., Health & Safety Code, Section 591.003(13) ("mental retardation" means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period); V.T.C.A., Health & Safety Code, Section 591.003(16) ("person with mental retardation" means a person determined by a physician or psychologist licensed in this state or certified by the department to have subaverage general intellectual functioning with deficits in adaptive behavior). And, *Penry* also expressly relies on the AAMR three-part definition of mental retardation.

"Persons who are mentally retarded are described as having 'significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.' American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation 1 (H. Grossman ed.1983). To be classified as mentally retarded, a person generally must have an IQ of 70 or below. (Citation Omitted). Under the AAMR classification system, individuals with IQ scores between 50–55 and 70 have 'mild' retardation. Individuals with scores between 35–40 and 50–55 have 'moderate' retardation. 'Severely' retarded people have IQ scores between 20–25 and 35–40, and 'profoundly' retarded people have scores below 20 or 25. (Citation Omitted). Approximately 89% of retarded persons are 'mildly' retarded. (Citation Omitted).

*Penry*, 492 U.S. at 307–09 fn. 1, 109 S.Ct. at 2941 fn. 1."

■ The first part of the AAMR test is measured by IQ, and an individual must have an IQ test score of 70 or less to meet the first part of the AAMR definition of mental retardation. See 24 St. Mary's Law Journal Number 4 at 1316–17. However, that does not end the inquiry or mean that everyone with an IQ of 70 or below is mentally retarded; it means only that all mentally retarded persons have an IQ of 70 or below. Because of their unreliability in determining mental retardation, IQ scores should not be used as a "unitary measure of mental retardation;" a low IQ alone does not provide a justifiable basis for classifying a person as mentally retarded. See *id.* at 1329–35.

And, some argue that using IQ scores as the sole measure of mental retardation could have negative social consequences for all persons with low IQ scores who are "perfectly capable of a self-sustaining life." See *id.* at 1338–40. They argue this could present a potential danger to the liberty of these citizens. See *id.*

The second part of the AAMR definition of mental retardation is not quantifiable; it measures a person's ability to function properly in society such as, for example, meeting the needs of day to day life. See *id.* at 1317–20. And, the third part of the AAMR definition requires a person to exhibit parts one and two of the AAMR definition during his developmental period. See *id.* Once the three-part AAMR definition is met, IQ score ranges are utilized to measure the severity of mental retardation ranging from "mild" to "profound." See *id.* at 1321; *see also Penry*, 492 U.S. at 307–09 fn. 1, 109 S.Ct. at 2941 fn. 1.

Based on the foregoing, it arguably is clear that Johnny Paul Penry's evidence met the AAMR three-part definition of mental retardation and Section 591.003(13) of the Health and Safety Code. See *Penry*, 492 U.S. at 307–311, 109 S.Ct. at 2941–42. However, it is clear that applicant's evidence of a low IQ score, standing alone, does not meet this definition. Qualitatively and quantitatively

applicant's low IQ evidence does not approach the level of Johnny Paul Penry's evidence of mental retardation. Based on the foregoing, we find no evidence in this record that applicant is mentally retarded.

■ Assuming the evidence of applicant's low IQ somehow falls within *Penry's* definition of mental retardation,[2] we still hold applicant is not entitled to relief under *Penry*. United States Supreme Court decisions before and after *Penry* have upheld the constitutionality of Texas' former special issues framework because this framework has allowed juries in the vast majority of cases to consider and give effect to relevant mitigating evidence in a meaningful manner. See *Johnson*, 509 U.S. at 361–67, 113 S.Ct. at 2666–68; *Graham v. Collins*, 506 U.S. 461, 473–75, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993); *Franklin v. Lynaugh*, 487 U.S. 164, 181–82, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). *Johnson* reaffirmed that as long as relevant mitigating evidence is within "the effective reach of the sentencer" the requirements of the Eighth Amendment are satisfied. *Johnson*, 509 U.S. at 367–69, 113 S.Ct. at 2669 (distinguishing *Penry* because special issue two provided the jury a meaningful basis to consider and give effect to the mitigating qualities of Johnson's youth). All the Constitution requires is that a jury be able to consider in some manner a defendant's relevant mitigating evidence. See *id.* The Constitution does not require that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant." See *id.*

The issue in cases like this is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction[s] in a way that prevents the consideration of constitutionally relevant evidence.' " See *Johnson*, 509 U.S. at 367–71, 113 S.Ct. at 2669–70. We should evaluate the instructions with a " 'commonsense understanding of the instructions in the light of all that has taken place at trial.' " See *Johnson*, 509 U.S. at 367–69, 113 S.Ct. at 2669. This involves a

---

**2.** See *Penry*, 492 U.S. at 307–09 fn. 1, 109 S.Ct.     at 2941 fn. 1.

case-by-case approach requiring a consideration of the specific facts of each case. And, this is the approach the Supreme Court followed in *Penry*. *See Penry*, 492 U.S. at 307–14, 320–330, 109 S.Ct. at 2941–44, 2948–2952. There are no bright-line rules in cases like this.

In *Penry*, Johnny Paul Penry presented evidence that his mental retardation made it impossible for him at the time of the offense to appreciate the wrongfulness of his conduct or to conform his conduct to the law. *Penry*, 492 U.S. at 307–09, 320–30, 109 S.Ct. at 2941, 2949; see also *Johnson*, 509 U.S. at 363–65, 113 S.Ct. at 2667 (evidence suggested that Penry's mental retardation *rendered him unable to learn from his mistakes*); *Graham*, 506 U.S. at 473–75, 113 S.Ct. at 901 (Court considered Penry's evidence to be mitigating because *it diminished Penry's ability to control his impulses or to evaluate the consequences of his conduct*). Johnny Paul Penry's evidence was relevant mitigating evidence because the Supreme Court identified a long-held belief by society "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry*, 492 U.S. at 318–20, 109 S.Ct. at 2947; see also *Johnson*, 509 U.S. at 369–71, 113 S.Ct. at 2670.

However, the special issues placed the mitigating qualities of Johnny Paul Penry's evidence beyond the effective reach of the jury because it could not be determined for sure whether the jury could have given "appropriate" mitigating effect to the evidence in answering special issue one. See *Johnson*, 509 U.S. at 363–65, 369–71, 113 S.Ct. at 2667, 2770. More importantly, the jury could have given Johnny Paul Penry's evidence *only* aggravating effect in answering special issue two. *See Johnson*, 509 U.S. at 363–65, 113 S.Ct. at 2667 (Penry's mitigating evidence was relevant to the second special issue *only* as an aggravating factor because it suggested a "yes" answer to that special issue); *Penry*, 492 U.S. at 322–24, 109 S.Ct. at 2949. Johnny Paul Penry was entitled to relief not because of his mental retardation standing alone, but because the special issues placed

beyond the effective reach of the jury the mitigating qualities of Penry's evidence that his mental retardation rendered him unable to appreciate the wrongfulness of his conduct when he committed the offense. *See also Johnson*, 509 U.S. at 363–65, 367–71, 113 S.Ct. at 2667, 2669–70, ; *Graham*, 506 U.S. at 473–75, 113 S.Ct. at 901; *Penry*, 492 U.S. at 307–09, 322–24, 335–39, 109 S.Ct. at 2941, 2949, 2956–57 (in light of the diverse capacities and life experiences of mentally retarded people, it cannot be said that all mentally retarded people, by definition, can never act with the level of culpability associated with the death penalty).

Here, there is no evidence applicant's low IQ rendered him unable to appreciate the wrongfulness of his conduct when he committed the offense, or that his low IQ rendered him unable to learn from his mistakes or diminished his ability to control his impulses or to evaluate the consequences of his conduct. *See Johnson*, 509 U.S. at 363–65, 113 S.Ct. at 2667; *Graham*, 506 U.S. at 473–75, 113 S.Ct. at 901. Therefore, there was no danger, as in *Penry*, that the jury would have given any mitigating qualities of the evidence of applicant's low IQ *only* aggravating effect in answering special issue two. *See Johnson*, 509 U.S. at 363–65, 369–71, 113 S.Ct. at 2667, 2669–70; *Penry*, 492 U.S. at 322–24, 109 S.Ct. at 2949.

In addition, the special issues did not place mitigating qualities of the evidence of applicant's low IQ beyond the effective reach of the jury. The jury could have used this evidence for a "no" answer to the first special issue on "deliberateness." *See Penry*, 492 U.S. at 322–24, 109 S.Ct. at 2949. Moreover, in considering the circumstances of this offense and applicant's prior felony rape conviction in connection with special issue two, the jury could have used the low IQ evidence to conclude applicant was a "follower" instead of a "leader" since he participated in the commission of both crimes with others. *See*, e.g., *Ellason v. State*, 815 S.W.2d 656, 660 (Tex.Cr.App.1991) (one factor to consider in determining whether the evidence is sufficient to support an affirmative answer to special issue two is whether the defendant was acting under duress or the domination of

another at the time of the offense); see also *Johnson,* 509 U.S. at 371–73, 113 S.Ct. at 2671. There was ample room within special issue two for the jury to give effect to any mitigating qualities of applicant's low IQ evidence.

All requested relief is denied.

OVERSTREET and WOMACK, JJ., dissent.

MEYERS, Judge, concurring.

Applicant contends the jury that sentenced him to death was unable to consider and give mitigating effect to evidence of his mental retardation, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.[1] *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Applicant is not entitled to relief because the record does not contain sufficient evidence to support his claim.

*I*

In 1972, the Supreme Court held that the imposition of the death penalty in Texas for the offense of rape violated the Eighth and Fourteenth Amendments to the United States Constitution.[2] Subsequently, the Texas legislature narrowed the scope of death penalty crimes to murder committed in specified circumstances, and required the jury to answer special issues regarding deliberateness, future dangerousness, and in some instances, provocation. *Jurek v. Texas,* 428 U.S. 262, 268–69, 96 S.Ct. 2950, 2954–55, 49 L.Ed.2d 929 (1976). In a plurality opinion, the Supreme Court upheld the new Texas death penalty scheme as facially constitutional, in part, because the special issues permitted the jury's *consideration* of mitigating

factors. *Id.* at 272–74, 276, 96 S.Ct. at 2956–57, 2958. Not only must the defendant be allowed to present mitigating evidence to the jury, but the jury "must also be able to consider and give effect to that evidence in imposing [its] sentence." *Penry,* 492 U.S. at 319, 109 S.Ct. at 2947 (citing *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987)).

In 1989, that Court held that the special issues of article 37.071(b) were unconstitutional as applied to Johnny Paul Penry because they did not provide the jury with a vehicle in which to give full mitigating effect to evidence of Penry's mental retardation, arrested development, and background of childhood abuse. *Penry.* At Penry's trial, a psychiatrist testified "that Penry suffered from organic brain damage and moderate [mental] retardation, which resulted in poor impulse control and an inability to learn from experience," *id.* at 308, 109 S.Ct. at 2941, and that the organic brain disorder was probably caused at birth, but could have been the result of early childhood beatings. *Id.* at 308–309, 109 S.Ct. at 2941–42. Penry's sister testified that their mother frequently beat Penry with a belt over the head when he was a child, and that he was regularly locked in his room for long periods without access to a toilet. *Id.* at 309, 109 S.Ct. at 2941–42. The State presented rebuttal testimony from two psychiatrists who testified that Penry was not suffering from a mental defect at the time of the offense; however, the two psychiatrists also testified that Penry was unable to learn from experience. *Id.* 309–10, 109 S.Ct. at 2941–42.

The Supreme Court noted that evidence of Penry's mental retardation, arrested development, and abused background had "relevance

---

1. Appellant also claims the jury was unable to consider and give mitigating effect to evidence of his youth and youthful incarceration. Both this Court and the Supreme Court have rejected claims that evidence of youth and good prison record requires an additional jury instruction. *See, e.g., Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)(youth); *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)(good prison disciplinary record); *Jones v. State,* 843 S.W.2d 487, 497 (Tex.Crim.App.1992)(good behavior in prison), *cert. denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Ex parte Jacobs,* 843

S.W.2d at 520 (education during prison); *Ex parte Harris,* 825 S.W.2d at 122 (youth).

2. *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), was decided in conjunction with *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Also decided with *Furman* was *Jackson v. Georgia.* In *Branch* and *Jackson,* the defendants were assessed the death penalty for committing rape; in *Furman,* the defendant was assessed the death penalty for committing murder.

to his moral culpability beyond the scope of the special issues," and that the jury could not consider and give mitigating effect to that evidence absent an additional jury instruction. *Id.* at 322, 109 S.Ct. at 2948–49. Further, Penry's evidence was considered to be double-edged under the second special issue in that it simultaneously diminished blameworthiness for the crime, but also indicated a probability of future dangerousness, *id.* at 324, 109 S.Ct. at 2949–50, and that the jury could only give aggravating effect to that evidence. *Id.* at 323, 109 S.Ct. at 2949. Thus, an additional instruction was mandated, one "informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty." *Id.* at 328, 109 S.Ct. at 2951–52.

Following *Penry,* this Court has been presented with numerous claims from other defendants sentenced to death asserting that absent a *"Penry* instruction," their sentencing juries could not and did not give mitigating effect to such evidence as, for example, alcoholism/drug abuse, troubled background, and certain types of mental illness. In cases too numerous to mention, this Court has rejected such claims as not falling within the *Penry* rule. *See, e.g., Robison v. State,* 888 S.W.2d 473 (Tex.Crim.App.)(childhood sexual abuse, schizophrenia, drug abuse, and remorse), *cert. denied,* 515 U.S. 1162, 115 S.Ct.

2617, 132 L.Ed.2d 859 (1995); *Mines v. State,* 852 S.W.2d 941 (Tex.Crim.App.1992)(insanity and manic depression), *vacated,* 510 U.S. 802, 114 S.Ct. 42, 126 L.Ed.2d 13 (1993);[3] *Ex parte Jacobs,* 843 S.W.2d 517 (Tex.Crim.App.1992)(troubled background, cooperation with police, remorse, and positive character traits), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Ex parte Harris,* 825 S.W.2d 120 (Tex.Crim.App.1991)(circumstances of offense, remorse, cooperation with police, youth, and alcoholism). With one exception,[4] this Court has sustained a *Penry* claim *only* when there is evidence of mental retardation. *See Rios v. State,* 846 S.W.2d 310, 315 (Tex. Crim.App.1992), *cert. denied,* 507 U.S. 1051, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993); *Richard v. State,* 842 S.W.2d 279, 280–83 (Tex.Crim.App.1992); *Ex parte Williams,* 833 S.W.2d 150 (Tex.Crim.App.1992); *Ex parte McGee,* 817 S.W.2d 77 (Tex.Crim.App. 1991); *Ex parte Goodman,* 816 S.W.2d 383 (Tex.Crim.App.1991); *Ramirez v. State,* 815 S.W.2d 636, 655–56 (Tex.Crim.App.1991). But even in those cases, the evidence of mental retardation was always something more than what was presented in this case.

## II

The American Psychiatric Association (APA) has stated that the essential feature of mental retardation is "significantly subaverage general intellectual functioning" ac-

---

3. The Supreme Court vacated our judgment and remanded *Mines* to us in light of *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

4. *Gribble v. State,* 808 S.W.2d 65, 75–76 (Tex. Crim.App.1990), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). In *Gribble,* the defendant was sentenced to death for murder during the course of a kidnapping. Gribble claimed he had consensual sex with the deceased. Gribble presented evidence of a troubled childhood. Gribble's mother was institutionalized for mental illness and his father for burglary. Further, Gribble's mother sexually abused him when he was a small child. A psychoanalyst testified that those experiences, even if delusional, indicated the same mental illness as suffered by Gribble's mother, and that throughout his adult life, Gribble suffered from a delusional fear of sexual domination which resulted in violence towards women. This Court held

that under *Penry,* Gribble was entitled to an additional jury instruction.

In a case in a category by itself, this Court held the third special issue of article 37.071(b) was unconstitutional as applied. *First v. State,* 846 S.W.2d 836, 837–42 (Tex.Crim.App.1992). In *First,* the defendant was sentenced to death for murdering more than one person in the same criminal transaction. First and three acquaintances were leaving a bar when one of them attacked First and repeatedly slammed his head onto the sidewalk. When the attacker attempted to flee with one of the other acquaintances, First shot them. First's attacker was not the first named victim in the indictment. Since article 37.071(f) precluded the jury from considering the provocation of any other deceased besides that of the first named in the indictment, we held that the third special issue was unconstitutional as applied to First because the jury could not give mitigating effect to evidence of provocation on the part of First's attacker.

companied by "significant limitations in adaptive functioning," the onset of which must occur before age 18. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 39 & 46 (4th ed. rev.1994)(hereinafter *DSM–IV*); *see also* American Association on Mental Deficiency (AAMD), *Classification in Mental Retardation* 1 (Herbert J. Grossman ed.1983)(hereinafter AAMD)("Mental retardation refers to significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period"). While dementia shares characteristics with mental retardation, its onset may occur after age eighteen. *DSM–IV* at 45, 137, 139.[5] However, for *Penry* purposes, courts should not distinguish between mental retardation and dementia. *See* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L.Rev. 414, 422–23 (1985).

"General intellectual functioning is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered general intelligence tests (e.g., Weschler Intelligence Scales for Children—Revised, Stanford Binet, Kaufman Assessment Battery for Children)." *DSM–IV* at 39. "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)." *Id.*; *see also* AAMD at 1. Professionals are flexible in their clinical assessments of mental retardation, sometimes determining that someone with an IQ of above 70 is mentally retarded or that someone with an IQ of below 70 is not mentally retarded. AAMD at 23. IQ tests differ in content and in the way they measure IQ. *Id.* at 56–57; *see Ex parte Williams*, 833 S.W.2d at 152. Therefore, it is important to know which test was administered in determining what an IQ score represents.

"Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her[6] age level and cultural group, as determined by clinical assessment and, usually, standardized scales." AAMD at 11. Such standardized methods of measuring an individual's adaptive functioning or behavior include the Vineland Adaptive Behavior Scales and the AAMD Adaptive Behavior Scale. *DSM–IV* at 40. A determination of adaptive functioning may also be made by teacher evaluation and educational, developmental, and medical history. *Id.* Thus, an individual should not be classified as mentally retarded unless he is deficient in both intellectual functioning, as indicated by IQ, and in adaptive behavior.[7]

---

5. According to the APA:

> The essential feature of a dementia is the development of multiple cognitive deficits that include memory impairment and at least one of the following cognitive disturbances: aphasia, apraxia, agnosia, or a disturbance in executive functioning. The cognitive deficits must be sufficiently severe to cause impairment in occupational or social functioning and must represent a decline from a previously higher level of functioning.
>
> *DSM–IV* at 135.

6. Mental Retardation is more common among men than women. *Id.* at 44.

7. In the Persons with Mental Retardation Act, the Texas legislature has adopted definitions similar to the AAMD and the APA regarding mental retardation:

> "Adaptive behavior" means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group.
>
> \* \* \* \* \* \*
>
> "Mental retardation" means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period.
>
> \* \* \* \* \* \*
>
> "Persons with mental retardation" means a person determined by a physician or psychologist licensed in this state or certified by the department to have subaverage general intellectual functioning with deficits in adaptive behavior.
>
> \* \* \* \* \* \*
>
> "Subaverage general intellectual functioning" refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used.
>
> Tex. Health & Safety Code Ann. § 591.003(1), (13), (16) & (20) (Vernon 1994).

In the instant case, applicant's parole officer testified at punishment that applicant's parole record reflected that his IQ was 67. He testified that when applicant was incarcerated for a previous offense, the Texas Department of Corrections administered to applicant a test to determine his IQ, but the parole officer was "not sure exactly what kind of test, what they test them for." The parole officer further testified that applicant's parole record did not purport to be a psychologist's report, rather it was a record of applicant's criminal and social history. The parole officer acknowledged that the parole record did not indicate by whom or under what circumstances the test was administered.

During closing arguments, the prosecutor told the jury:

> I'm sure the Defense is going to ask you to forgive [applicant] for what he's done. Say that he has a low IQ and that you should give him another chance. Well, ladies and gentlemen, you be the judge of that. If you feel like that's what you need to do, then that's what you need to do. But I ask you to make your decision based on the facts.

Defense Counsel remarked:

> Then I called a witness who testified he's [applicant's] parole officer. Uncontroverted evidence that when [applicant] was examined, when he got out of the penitentiary, by the officials who determined how to classify him, how to treat him, the same information that was communicated to his parole officer, what to do for him, how to help him when he's out on parole. Information that the prison psychiatrist had, the information that they gave is that [applicant] has got a 67 IQ. The same guy that told this poor unfortunate woman that was trying to work that day, "Well, if I let you in there, will you leave?" And he believed her. This guy with the 67 IQ, and she goes in and, sure enough, she escapes,

just like she should have.[8] That is uncontroverted testimony before you, that we have got a man before us that has got an intelligence quotient before us that is that low.

\* \* \*

Now you're charged with acting as [applicant's] peers. You have to judge him as his peers. That's going to be hard for you to do. None of you grew up where he grew up. Only one of you is black and none of you are suffering from a 67 IQ.

The prosecutor responded:

> [Defense Counsel] has told you that [applicant] has an IQ of 67. We heard no expert testimony from a psychologist who administered a battery of psychological tests. All we have got is this little piece of paper with a number of things listed in which someone—we don't know who has—written in 67. But whether he has a low IQ or not is not really the issue. Because the legislature, in asking you to address that question [the second special issue], the reasons why he became a danger are not really relevant. The fact that he is a danger, that the evidence shows he's a danger, is the criteria to use in answering that question.

The evidence presented at applicant's trial did not show that applicant was mentally retarded as the AAMD or the APA has defined it. There was no testimony regarding when applicant's IQ was measured or what tests where used to measure it. There was no testimony as to the range of IQ or what is considered mentally retarded. There was no testimony or notation on the parole record that applicant was mentally retarded. And, the record is devoid of any evidence indicating that applicant's adaptive functioning was that of a mentally retarded individual.

8. At punishment, a woman testified regarding an extraneous offense in which applicant and two men drove up to her while she was waiting for a bus to take her to work and forced her into their car. The men drove her to a vacant apartment where they took turns sexually assaulting her. Afterwards, they drove her to another apartment where she managed to escape by telling applicant that she needed to take a bath. Applicant asked her if she was going to escape, she said no and applicant allowed her to go to the bathroom where she escaped through the window and subsequently notified the police.

Primarily relying on an unpublished opinion, applicant contends evidence of an IQ of below 70 alone requires a *"Penry* instruction." However, "[u]npublished opinions have no precedential value and must not be cited as authority by counsel or by a court." Tex.R.App. P. 77.3. The AAMD and the APA disagree with applicant's contention, and in the cases holding that a *"Penry* instruction" was required, the evidence of mental retardation consisted of more than evidence of an IQ below 70. *See Penry* (organic brain damage caused at birth or early childhood abuse and an inability to learn from experience); *see also Rios*, 846 S.W.2d at 315 (testimony from doctors regarding when and how defendant's IQ was measured and conclusion that he was mentally retarded); *Richard*, 842 S.W.2d at 280–83 (severe childhood abuse and doctor's conflicting conclusion that defendant was mentally retarded); *Ex parte Williams*, 833 S.W.2d at 151–52 (testimony regarding when and how defendant's IQ was measured and conflicting conclusions as to whether defendant was mentally retarded); *Ex parte McGee;* 817 S.W.2d at 79–80 (organic brain damage and severe childhood abuse); *Ex parte Goodman*, 816 S.W.2d at 385–86 (testimony that defendant was mentally retarded and possibly suffered from brain damage); *Ramirez*, 815 S.W.2d at 655–56 (childhood abuse, doctor's conflicting testimony as to whether defendant was mentally retarded, and psychological evaluation assessing intelligence and likelihood of organic brain dysfunction).

For these reasons, applicant is not entitled to relief.[9] I therefore join in the judgment of the Court.

PRICE, J., joins.

BAIRD, Judge, dissenting.

In a consistent and unbroken line of cases since the Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), this Court has held evidence of mental retardation cannot be adequately considered within the statutory punishment issues.[1] However, rather than follow this settled precedent, the majority ignores it to reach a desired result. Accordingly, I am compelled to lodge this dissent.

## I.

When the evidence raises a fact issue concerning the defendant's mental retardation, the defendant is "entitled to an instruction

9. Applicant is simply not entitled to relief on his claim because there is not enough evidence in the record to support it. The majority comes to this conclusion, too, *Tennard*, at 61, but goes on to offer another basis for denying relief. Assuming arguendo there had been enough evidence in the record of mental retardation, the majority says that reading *Penry*, and subsequent Supreme Court cases like *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), and *Graham v. Collins*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), together, applicant still would not have been entitled to an additional instruction because there was no evidence that his low IQ "rendered him unable to appreciate the wrongfulness of his conduct when he committed the offense, or that his low IQ rendered him unable to learn from his mistakes or diminished his ability to control his impulses or to evaluate the consequences of his conduct." *Id.* at 61–62. While I don't necessarily disagree with this reasoning, it is dicta and unnecessary to the disposition of applicant's claim. Moreover, it overrules several cases from this Court, without acknowledgment. *See Rios*, supra; *Ex parte Williams;* supra; *Ex parte Goodman*, supra.

1. In *Penry*, the Supreme Court held our capital sentencing scheme operated in an unconstitu-

tional manner when the statutory punishment issues of Tex.Code Crim. Proc. art. 37.071 failed to provide a vehicle for the jury to consider and give effect to potentially mitigating evidence. 492 U.S. at 328, 109 S.Ct. at 2952. During his trial, *Penry* presented evidence of an abused childhood, mental retardation and organic brain damage. 492 U.S. at 308–09, 109 S.Ct. at 2941. The Supreme Court held:

> ... full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned *moral* response to the defendant's background, character, and crime. In order to ensure reliability in the determination that death is the appropriate punishment in a specified case, the jury must be able to consider and given effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.

492 U.S. at 328, 109 S.Ct. at 2951 (internal citations and quotations omitted) (emphasis in original). The Supreme Court concluded the statutory punishment issues of art. 37.071 failed to provide the jury with a vehicle to give effect to Penry's mitigating evidence. 492 U.S. at 328, 109 S.Ct. at 2952.

empowering the jury to assess a penalty less than death, notwithstanding affirmative answers to the special issues, as a 'reasoned moral response' to the fact of his mental retardation." *Rios v. State*, 846 S.W.2d 310, 315 (Tex.Cr.App.1992). In *Rios*, appellant presented "testimony from two witnesses to the effect that appellant tested in the mildly retarded range." *Id.*, at 315. Both of the witnesses had examined Rios five years prior to the date of the offense. After reviewing the evidence presented, this Court held:

> In our view there was a reasonable likelihood that the jury in this case failed to understand that it was entitled to measure evidence of appellant's mental retardation for whatever mitigating weight it may have apart from the special issues.... Article 37.071 ... does not expressly accommodate mitigating evidence apart from its relevance to the special issues. Without more explanation, an instruction that baldly tells the jury it may consider evidence to be mitigating that seems either altogether irrelevant to the special issues, or relevant only in an aggravating sense, is likely in the context of our scheme to confound rather than inform.... Without clearer guidance it seems likely the jury would limit its consideration of appellant's mental retardation to whatever tendency it had to disprove deliberateness or to prove future dangerousness. Under *Penry* appellant was entitled to more.

*Rios*, 846 S.W.2d at 317.

In *Ex parte Williams*, 833 S.W.2d 150 (Tex.Cr.App.1992), the defense produced evidence through an expert witness that applicant had an I.Q. of 53, which is considered mentally retarded. *Id.*, at 151. The State offered rebuttal testimony from an expert witness who testified that "mental retardation cannot be determined solely from intelli-

gence tests" and that further tests would have to be conducted to determine if the applicant was actually mentally retarded. *Id.*, at 152. This Court held "that applicant [Williams] was entitled to a charge instructing the jury that it could consider and give mitigating effect to evidence of his mental retardation." *Id.* (footnote omitted). We so held even though the State argued that it was not a *Penry* case, because there was no evidence of organic brain damage or injury to the applicant. However, this Court specifically refused to interpret "*Penry* to be so limited[,]" *Id.* (citing *Ramirez v. State*, 815 S.W.2d 636, 655–56 (Tex.Cr.App.1991)), and held that when a fact issue is raised concerning the defendant's mental retardation, the jury must be instructed in a manner allowing the jury to consider and give effect to such evidence. *Id.*, at 152.[2]

In *Ramirez v. State*, 815 S.W.2d 636 (Tex. Cr.App.1991), we again held that evidence of mental retardation could not adequately be considered within the statutory punishment issues. In *Ramirez*, Dr. Sarmiento, a defense witness, testified that six years before Ramirez's offense, Sarmiento reviewed an I.Q. test wherein Ramirez scored 57. On cross-examination, Sarmiento admitted he had never actually seen Ramirez and, at the time of the review, Sarmiento had counseled against finding Ramirez mentally retarded. *Id.*, at 655. Even so, we held: "Upon review of this evidence and the *Penry* decision, we are compelled to conclude [Ramirez] was entitled to a charge instructing the jury that it could consider and give mitigating effect to [Ramirez's] evidence." *Id.*, at 656.

In *Ex parte McGee*, 817 S.W.2d 77 (Tex. Cr.App.1991), evidence was presented that applicant had "scored 66 on an I.Q. test given shortly before trial" and that "[p]revious test

---

2. This Court also found it important in *Williams* that during the prosecutor's closing argument, it was argued that there was "no proof of mental retardation." *Id.*, at 152, n. 7. This argument is very similar to the closing argument made by the prosecutor in the instant case:

"[w]hether [applicant] has a low I.Q. or not is not really the issue. Because the legislature, in asking you to address that [second special issue], the reasons why he became a danger

are not really relevant. The fact that he is a danger, that the evidence shows he's a danger, is the criteria to use in answering that [issue]." However, the majority not only fails to mention the State's closing argument, it fails to mention that it was very likely this argument precluded the jury from giving mitigating effect to evidence of applicant's mental retardation. *See, Williams*, 833 S.W.2d at 152, n. 7.

results provided similar scores....”[3] *Id.*, at 80. This Court set aside the conviction, holding: “the record reflects that McGee was mentally retarded.” *Id.* Additionally, we again stated the importance of this type of evidence:

> The Eighth Amendment prohibits imposition of the death penalty when the jury is not permitted to express a “reasoned moral response” to potentially mitigating evidence.... Because the jury was not allowed to consider McGee’s mitigating evidence of mental retardation and an abusive childhood as required by the Supreme Court’s holding in *Penry v. Lynaugh,* we set aside the conviction....

*Id.*, at 80.

In *Richard v. State,* 842 S.W.2d 279 (Tex. Cr.App.1992), testimony was introduced at the guilt/innocence phase of appellant’s trial that he had “an I.Q. score of 62, which places him in the upper limits of the mentally defective range.” *Id.*, at 281. The witness then agreed that appellant was “educable mentally retarded[,]” but then on crossexamination he described appellant “as slow but not retarded—at least not in the way that most people think of retarded people, no.” *Id.* (internal quotations omitted). This Court held: “[t]hese mitigating facts are quite similar to those detailed in *Ramirez* ...” and that “[l]ike Ramirez, appellant tested in the ‘mentally defective’ range.” *Id.*, at 283. Therefore, “appellant was entitled to a jury instruction authorizing the jury to impose a sentence less than death on the basis of this evidence.” *Id.*, at 283.

In *Ex parte Goodman,* 816 S.W.2d 383 (Tex.Cr.App.1991), evidence was presented at the punishment hearing that applicant had an I.Q. of 56, an intellectual level of an eight or nine year old, attended school only to the sixth grade and that he possibly suffered from brain damage. *Id.*, at 385–386. We granted habeas relief because the “jury was precluded from giving mitigating effect to [Goodman’s] evidence.” *Id.*, at 386.

Especially compelling is the case of *Ex parte Bell* (Tex.Cr.App. No. 70,946, delivered November 6, 1991) (unpublished op.), where the following evidence was developed by Bell’s stepfather:

Question: Did—are you acquainted in any way—are you familiar with Walter’s IQ?

Answer: Yes.

Question: And what is that?

Answer: Fifty-four.

Question: And has it been that way for some time?

Answer: Yes.

Question: To your knowledge, was it that way back in Nineteen-seventy-four?

Answer: Yes.

*Bell,* slip op. pp. 2–3 (see Appendix). This Court held that “Bell presented sufficient evidence to raise the issue of his mental retardation[,]” *Id.*, slip op. pg. 2, and therefore, “the jury was not instructed to consider and, if necessary, give effect to the mitigating evidence of [Bell’s] mental retardation.” *Id.*, slip op. pg. 3.[4]

All these holdings were reaffirmed in *Earhart v. State,* 877 S.W.2d 759 (Tex.Cr.App. 1994), where this Court held: *“evidence of mental retardation* falls beyond the scope of the statutory punishment issues.” *Id.*, at 765 (emphasis added) (citation omitted). However, the majority does not even mention these cases, much less attempt to distinguish them from the instant case.[5] It is the height of

---

3. Just as in this case, there was no evidence presented at McGee’s trial of when his I.Q. was measured or what tests were used to measure it. Nor was there any testimony as to the range of I.Q. or what is considered mentally retarded and there was no evidence indicating that McGee’s adaptive functioning was that of a mentally retarded individual. However, this Court granted habeas relief. Nevertheless, Judge Meyers now thinks that all of the above are necessary. *See, Ante,* at 67 (Meyers, J., concurring). But our holding in *McGee* undermines his position.

4. Because *Bell* was not designated for publication, it is not cited for its precedential value, but only as an example of the majority’s refusal to treat similarly situated persons the same.

5. Judge McCormick, who authors the majority opinion, either voted for or specifically concurred in each and every opinion discussed in this section. But today, in an effort to hide from those votes, he does not even inform the reader of their existence. Instead, Judge McCormick ignores his own advice, namely: “If a majority of this Court agrees on a principle of law, then that constitutes a ‘holding’ of this Court.... Princi-

intellectual dishonesty to intentionally mislead the bench and bar by failing to inform them of controlling decisions of this Court.

## II.

### A.

The issue in this case is whether the jury had a vehicle by which it could consider the mitigating evidence.[6] However, the majority intentionally misstates the issue as: "The first question we must ask is whether there is any evidence that applicant is mentally retarded." *Ante*, pg. 60. In that view, the majority holds that to be mentally retarded, a person must show: (1) sub-average general intellectual functioning; (2) concurring deficits in adaptive behavior; and, (3) onset during the developmental period.[7] *Ante*, pg. 60. What the majority has done, in clear contravention of established precedent, is weigh the sufficiency of applicant's mitigating evidence and establish a legal threshold a defendant must meet to be entitled to a *Penry* instruction.

ples of *stare decisis* requires this Court to follow its earlier majority opinions. *This is so basic that it requires no citation to authority." State v. Daugherty*, 931 S.W.2d 268, 279 (Tex.Cr.App. 1996) (McCormick, P.J., concurring and dissenting) (emphasis added).

**6.** In *Penry, supra*, the Supreme Court was not concerned with whether Penry was or was not mentally retarded. This is evidenced by the fact that in *Penry*, the Supreme Court granted certiorari, *inter alia*, to answer the following question:
[W]as Penry sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them?
*Penry*, 492 U.S. at 313, 109 S.Ct. at 2943–44.

**7.** Both the majority, *Ante*, pg. 60, and the concurrence, *Ante*, pg. 65, n. 7 (Meyers, J., concurring), place much emphasis on the fact that the Texas Legislature adopted similar definitions in the Persons With Mental Retardation Act. *See*, Health & Safety Code § 591.003 (Vernon 1992). However, what both the majority and concurrence fail to mention is that these definitions were adopted in *1991, six* years after the commission of the instant offense and *five* years after applicant's trial. *See*, Acts 1991, 72nd Leg., ch. 76, § 1. Additionally, this definition was not even adopted by the American Association of Mental

This Court has long held that it will not weigh mitigating evidence. A defendant is entitled to an instruction on every mitigating issue raised by the evidence, regardless of whether the evidence is strong or weak, unimpeached or contradicted and regardless of whatever the trial judge may think about the credibility of the offense. *Arnold v. State*, 742 S.W.2d 10, 13 (Tex.Cr.App.1987). For example, in *Ex parte Ellis*, 810 S.W.2d 208 (Tex.Cr.App.1991), the State contended Ellis was not entitled to relief under *Penry* because the "evidence was not argued as mitigating applicant's blameworthiness for the crime...." *Id.*, at 211. Nevertheless, we held:

> ... regardless of when this evidence was presented ... it is before the jury, and it is a proper subject for the jury's consideration when answering the punishment issues.... *The question is merely whether this evidence was before the jury for its consideration.*

*Id.* (emphasis added). Therefore, it is clear that the issue is not whether applicant was,

Retardation until 1992, and even then, the AAMR classified individuals with an I.Q. score of 75 and below as presumptively retarded. AAMR Mental Retardation: Definition, Classification, and Systems of Supports 14 (9th ed.1992). *See also, Wills v. Texas*, 511 U.S. 1097, 1099, n. 1, 114 S.Ct. 1867, 1868, n. 1, 128 L.Ed.2d 488 (1994) (Blackmun, J., dissenting to the denial of certiorari) *and* N.M. Stat. Ann. § 31–20A–2.1(A) (Michie 1994) ("An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive of mental retardation."). Therefore, both the majority and the concurrence then hold applicant to an evidentiary standard that did not exist at the time of his trial.

This holding is especially strange in light of our holding in *Black v. State*, 816 S.W.2d 350 (Tex.Cr.App.1991), where we held that *Penry* constituted such a substantial change in the law that a defendant did not waive his right to assert a *Penry* violation by failing to object or request a mitigation charge at trial. *Id.*, at 374 (Campbell, J., concurring) (joined by McCormick, P.J., and Clinton, Overstreet, Maloney and Benavides, JJ.). It is absurd to on one hand excuse a defendant from making an objection or request but on the other hand to require the same defendant to meet a diagnostic definition that was not in existence at the time of his trial. However, this is what the majority and concurrence do. The consequence will be to effectively foreclose any successful *Penry* challenges in state court.

in fact, mentally retarded, but whether the jury had a vehicle with which to give effect to the mitigating evidence.

### B.

In *Penry*, the Supreme Court acknowledged that an I.Q. score of 70 or below classifies an individual as "mentally retarded." *Penry*, 492 U.S. at 308, n. 1, 109 S.Ct. at 2941, n. 1. *See also, Wills v. Texas, supra* note 9. Further, in *Ex parte McGee, supra*, this Court recognized that "[i]n order to be considered mentally retarded, a person must score below 70 on an I.Q. test." 817 S.W.2d at 81, n. 15. *See also, Zimmerman v. State*, 860 S.W.2d 89, 105, n. 14 (Tex.Cr.App.1993) ("*Penry* implies that a person with an I.Q. of 70 or below is presumptively retarded.") (citation omitted). Accordingly, under the prior decisions of both the United States Supreme Court and this Court, applicant's I.Q. of 67 is presumptive of his mental retardation and the majority's holding that there is "no evidence in this record that applicant is mentally retarded" is simply wrong.

### III.

### A.

The majority then goes on to state that "[a]ssuming the evidence of applicant's low I.Q. somehow falls within *Penry*'s definition of mental retardation, we still hold applicant is not entitled to relief under *Penry*." *Ante,* pg. 61 (footnote omitted). This is so, the majority reasons, because there was no evidence that his low I.Q. "rendered him unable to appreciate the wrongfulness of his conduct when he committed the offense, or that his low I.Q. rendered him unable to learn from his mistakes or diminished his ability to control his impulses or to evaluate the consequences of his conduct." *Ante,* pg. 62.

To reach this conclusion, the majority relies upon both *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), and *Graham v. Collins,* 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), for their proposition that applicant must prove his mental retardation rendered him unable to control his impulses or to evaluate the consequences of his actions.

Johnson contended the former version of Tex.Code Crim. Proc. Ann. art. 37.071 failed to provide the jury with a vehicle to consider and give effect to mitigating evidence of youth. 509 U.S. at 351, 113 S.Ct. at 2660. Johnson was nineteen at the time of his offense. 509 U.S. at 356, 113 S.Ct. at 2663. Recognizing that evidence of youth may be mitigating, the Supreme Court held:

> The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. We believe that there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination.

509 U.S. at 368, 113 S.Ct. at 2669. The Court concluded *Penry* does not require the jury to be able to give effect to mitigating evidence in every conceivable manner in which it might be relevant; mitigating evidence must only be within "the effective reach of the sentencer." 509 U.S. at 368, 113 S.Ct. at 2671. *See also, Graham,* 506 U.S. at 475–76, 113 S.Ct. at 901–902.

In *Graham v. Collins, supra,* Graham contended art. 37.071 did not allow his jury to consider and give effect to mitigating evidence of youth, family background, and positive character traits. 506 U.S. at 463, 113 S.Ct. at 895. In holding Graham's challenges were not cognizable on federal habeas corpus review, the Court stated: "We do not read *Penry* as effecting a sea of change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not* broadly suggest the invalidity of the special issue framework." 506 U.S. at 475, 113 S.Ct. at 901 (emphasis in original).

As the cases discussed in Section I, *supra,* illustrate, this Court has always held that the former punishment issues do not provide a vehicle for the jury to consider the mitigating evidence of mental retardation. Neither *Johnson* nor *Graham* impact those decisions; they only affirm the general proposition that most mitigating evidence is within the jury's reach when answering the punishment is-

sues. Moreover, *Penry* was neither overruled nor questioned in *Johnson* or *Graham.*

## B.

The majority, however, states the decision in *Penry* is premised upon the fact there was evidence presented "that his mental retardation made it impossible for him at the time of the offense to appreciate the wrongfulness of his conduct or to conform his conduct to the law." *Ante,* pg. 62. Thus, the majority concludes, without specifically saying so, there is a nexus requirement between the evidence of applicant's mental retardation and his moral culpability. However, this conclusion flies in the face of established precedent of this State.

In most cases applying *Penry,* this Court has required a "nexus between the mitigating evidence and culpability for the crime." *Lackey v. State,* 819 S.W.2d 111, 141, n. 10 (Tex.Cr.App.1989) (op. on reh'g). *See also, Goss v. State,* 826 S.W.2d 162, 165 (Tex.Cr.App.1992) ("the evidence must tend to excuse or explain the criminal act, so as to make that particular defendant not deserving of death."). A majority of this Court then adopted the nexus requirement in *Nobles v. State,* 843 S.W.2d 503 (Tex.Cr.App.1992). However, in our application of *Penry,* we have *never* required a nexus between mental retardation and the capital offense. *Richard,* 842 S.W.2d at 283 ("the Court has still not required an express showing of 'nexus' between evidence of mental defectiveness and the offense on trial."). *See also, Goodman,* 816 S.W.2d at 386; *Ramirez,* 815 S.W.2d at 655. This position was unanimously reaffirmed in *Earhart, supra,* where the Court stated: "we do not require proof of a nexus when the defendant presents evidence of mental retardation." 877 S.W.2d at 768, n. 9.

## IV.

The majority has obviously ignored settled law to achieve a desired result. This case is a classic example of a defendant who should be able to rely upon the notion, predicated upon *stare decisis,* that in our judicial system similarly situated defendants will receive similar treatment. Because he is not so treated, I dissent.

## APPENDIX

### Ex parte Walter Bell, Jr.

### No. 70,946

### Habeas Corpus Application from Jefferson County

#### OPINION

PER CURIAM.

This is a post conviction application for writ of habeas corpus.[1] Walter Bell seeks to set aside his death sentences based upon the claim that the sentencing jury was not allowed to consider and give effect to mitigating evidence of his mental retardation, religious allegiance, military service, and good character. We granted review to determine whether a defendant who introduces such evidence is entitled to a *Penry* instruction. We will grant applicant's claim.

On July 19, 1974, Fred and Irene Chisum were found murdered in their home. A police investigation led to the arrest of Walter Bell, Jr. He later confessed to the crimes. A jury convicted Bell of the capital murder of Irene Chisum. After the jury answered the statutory special issues in the affirmative, punishment was assessed at death. Bell's conviction was affirmed on direct appeal.[2] A second jury convicted Bell of the capital murder of Fred Chisum. Punishment in that case was assessed at death. Bell's second conviction was also affirmed on direct appeal.[3] This application relates to and arises from the second capital murder conviction.

In support of his claim, Bell relies upon *Penry v. Lynaugh.*[4] *Penry* declared the Texas death penalty scheme unconstitutional as applied because it failed to provide a

---

1. *See* Article 11.07, V.A.C.C.P.

2. *Bell v. State,* 582 S.W.2d 800 (Tex. Crim. App. 1979) cert. denied, 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981).

3. *Bell v. State,* 724 S.W.2d 780 (Tex. Crim. App. 1986) cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).

4. 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

manner by which the jury could consider and give effect to evidence of the defendant's severe childhood abuse and mental retardation. The special issues failed to provide a vehicle, which would allow the jury to express its "reasoned moral response" to mitigating evidence when it returned its decision. The Supreme Court, remanding the case, described mitigating evidence as that of a "defendant's background and character . . . [supporting a] belief, long held by society, that defendants who commit criminal acts that are attributable to [such circumstances] may be less culpable than defendants who have no such excuse."[5]

The trial court recommended that Bell be denied relief on the basis of procedural default. However, we have since recognized that a capital defendant does not waive his right to assert a *Penry* challenge when, at the time of trial, the right was not recognized.[6] As a result, Bell was not required to lodge a trial objection or request a special charge.

Bell claims that the special issues did not allow the jury to consider and give effect to evidence he presented at trial. Although evidence may be relevant to the second special issue, it may be relevant only as an aggravating factor because it suggests a "yes" answer to the question of future dangerousness.[7] When presented with evidence potentially reducing a defendant's moral culpability, a jury must be allowed to evaluate that evidence. If jurors are not afforded a vehicle allowing them to consider and give effect to such mitigating evidence, the death penalty scheme as applied does not pass constitutional muster.

Bell presented sufficient evidence to raise the issue of his mental retardation. The record reflects that Earl Brown, Bell's stepfather, gave the following testimony:

Question: Did—are you acquainted in any way—are you familiar with Walter's IQ?
Answer: Yes.
Question: And what is that?
Answer: Fifty–four.
Question: And has it been that way for some time?
Answer: Yes.
Question: To your knowledge, was it that way back in Nineteen–seventy–four?
Answer: Yes.

* * *

This specific evidence was neither objected to nor controverted. This indicates that Bell falls within the mild range of mental retardation.[8] IQ test results included in his application show that he scored 58 in diagnostic tests administered after his arrest. However, we do not consider the post arrest test in support of Bell's claim as this evidence was not before the jury.

*Penry* teaches that the Eighth Amendment prohibits imposition of the death penalty when the jury is not permitted to express a "reasoned moral response" to potentially mitigating evidence. The Supreme Court has determined that mental retardation is mitigating evidence of the type that requires a vehicle by which the jury has the opportunity to express its reasoned moral response. Here, as in *Penry*, the jury was not instructed to consider and, if necessary, give effect to the mitigating evidence of mental retardation. Thus, we are constrained by the United States Supreme Court holdings in *Penry v. Lynaugh* to hold, in the instant case, that the Texas death penalty scheme as applied to Walter Bell, Jr., is unconstitutional because the jury was not empowered to consider and give effect to his potentially mitigating evidence of mental retardation.

---

5. *Id.* at 319, 109 S.Ct. at 2947 (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)).

6. *Black v. State*, 816 S.W.2d 350 (Tex. Crim. App.1991) (Campbell, J., concurring) (joined by McCormick, P.J., Clinton, Overstreet, Maloney, and Benavides, JJ).

7. *Id.* at 323, 109 S.Ct. at 2949.

8. In order to be considered mentally retarded, a person must score below 70 on an I.Q. test. *Penry*, 492 U.S. at 308 n.1, 109 S.Ct. at 2941 n.1 (citing Ellis and Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash L. Rev. 414, 423 (1985)).

Accordingly, we set aside the conviction and order Bell Remanded to the custody of the Sheriff of Jefferson County to answer the indictment.

EN BANC

DELIVERED: November 6, 1991

DO NOT PUBLISH

McCormick, P.J. and White, J., concur in the result