United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 20, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 04-10245

IN RE: YOKAMON LANEAL HEARN,

                Movant.

On Motion for Authorization to File
Successive Petition for Writ of Habeas
Corpus in the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Movant Yokamon Laneal Hearn is a state prisoner on death row in Texas. He moves pursuant to 28 U.S.C. § 2244(b)(2)(A) for an order authorizing the filing and consideration of a second petition for writ of habeas corpus. Hearn's application is based on the new rule of constitutional law set forth in *Atkins v. Virginia*, 536 U.S. 304 (2002). He claims he is ineligible for execution under *Atkins* because he is mentally retarded. *Id*.

This Court may allow the filing of a second habeas application "only if it determines that the application makes a *prima facie* showing that the application satisfies the requirements of this subsection." 28 U.S.C. § 2244(b)(3)(C). Hearn must make a *prima facie* showing that (1) his claim has not previously been presented in a prior application to this Court, (2) his claim relies on a decision that stated a new, retroactively applicable rule of constitutional law that was previously unavailable

1

to him, and (3) that he is mentally retarded. *In re Johnson*, 334 F.3d 403, 404 (5th Cir. 2003). Texas concedes that Hearn satisfies the first two requirements, that is, his *Atkins* claim was not previously presented in any prior application to this Court, and *Atkins* respresents a new, retroactively applicable rule of constitutional law that was previously unavailable. The issue before this Court is whether Hearn has made a *prima facie* showing that he is mentally retarded.

A *prima facie* showing of mental retardation is "'simply a sufficient showing of possible merit to warrant a fuller [exploration] by the district court.'" *Id*. (quoting *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003)). Mental retardation is a disability characterized by three criteria: significant limitation in intellectual functioning, significant limitation in adaptive behavior and functioning, and onset of these limitations before the age of 18. American Association on Mental Retardation ("AAMR"), *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002).

Hearn's motion includes expert reports from Pablo Stewart, M.D., Mary Alice Conroy, Ph.D., and James R. Patton, Ed.D. Dr. Stewart's report does not address the question of whether Hearn is mentally retarded. Rather, it assesses Hearn for fetal alcohol syndrome ("FAS"). Dr. Stewart concludes that Hearn suffers from FAS and further notes that "[o]ne of the frequently occurring consequences of FAS is mental retardation. Indeed, FAS is the most commonly-identified case of mental retardation." Dr. Stewart's report offers an explanation for the cause of Hearn's alleged mental retardation; it neither diagnoses nor excludes mental retardation.

Dr. Conroy's psychological evaluation addresses the first prong of the mental retardation diagnosis, that is, it was conducted "in order to obtain an assessment of [Hearn's] general intellectual functioning." Dr. Conroy makes no conclusions regarding whether Hearn is mentally retarded; her findings relate only to Hearn's limitations in intellectual functioning.

2

The third expert, Dr. Patton, interprets Dr. Conroy's findings and determines that Hearn has significant limitations in intellectual functioning. Based on testing he administered, Dr. Patton further opines that Hearn has significant limitations in adaptive behavior and functioning. Finally, Dr. Patton determines that the onset of these limitations occurred before Hearn was 18. Dr. Patton concludes: "In summary, it is my professional opinion, based on the materials reviewed, the test results recently obtained, and the interviews with key respondents, that Mr. Hearn meets the criteria of mental retardation, as defined by the American Association of Mental Retardation."

Texas argues that Dr. Patton's opinion is facially invalid and cannot constitute a *prima facie* showing of mental retardation because Dr. Patton is not a licensed psychologist and Hearn presents no proof that Dr. Patton is certified by Texas to diagnose mental retardation. In Dr. Patton's assessment of mental retardation, he summarized his numerous qualifications and significant experience. Based on these qualifications, we decline to conclude that Dr. Patton is not qualified to assess and diagnose mental retardation for the purposes of Hearn's *prima facie* showing.

We reject the dissent's argument that we cannot consider Dr. Patton's opinion because he does not meet the Texas Health and Safety Code's standard for those who may determine mental retardation. This standard, found in Texas's Persons With Mental Retardation Act ("PMRA"), provides that mental retardation may be diagnosed only by "a physician or psychologist licensed in this state or certified by the [Texas Department of Mental Health and Mental Retardation]." TEX. HEALTH & SAFETY CODE ANN. § 591.003(16) (2005) (enacted before *Atkins*). This standard, however, has not been made applicable to *Atkins* proceedings.

The Supreme Court in *Atkins* left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Ex Parte Briseno*, 135 S.W.3d

3

1, 5 (Tex. Crim. App. 2004) (quoting *Atkins*, 536 U.S. at 317). In *Briseno*, the Texas Court of Criminal Appeals held that until the Texas legislature provides a statutory definition of mental retardation, it will use the definition of mental retardation promulgated by the AAMR and mirrored by subsection 591.003(13) of the PMRA when addressing *Atkins* claims. *Id*. at 8. Neither the AAMR definition nor subsection (13) of the PMRA addresses who is qualified to render an opinion on whether a particular person is mentally retarded. *Briseno* neither explicitly nor implicitly endorses subsection (16) of the PMRA, upon which the dissent relies to argue for Dr. Patton's exclusion; indeed, *Briseno* itself relied upon lay opinion to determine retardation. *Id*. at 18.

The dissent surmises that the majority is "saying that even if Patton is unqualified under Texas law to testify as an expert, he can state his 'opinions' as a lay witness." The dissent condemns this as an "astonishing notion" that would eviscerate the reasonable restrictions of Federal Rule of Evidence 703. We have no such notion. This criticism evinces a fundamental misunderstanding of both the reasoning in *Briseno* and the majority's argument.

Pointing to *Briseno*'s adoption of the AAMR and § 391.003(13) standards, the dissent concludes that it "follows logically that if the State of Texas, through its highest criminal court, has decided to use its statutory definition of 'mental retardation' in Atkins proceedings, it would be a 'no brainer' that the statutory definition of who is qualified to opine as to mental retardation would also apply." This conclusion, however, is belied by *Briseno* itself. In *Briseno*, the court observed that

> [a]lthough experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, *based upon all of the evidence and determinations of credibility*.

*Id*. at 9 (emphasis added). The court catalogued a number of "evidentiary factors" that a finder of

4

fact may consider when determining whether an defendant is mentally retarded, including whether "family, friends, teachers, employers [and] authorities" believed him to be mentally retarded during the developmental stage, whether he responds "coherently, rationally, and on point" to oral or written questions, and whether his "conduct in response to external stimuli" is "rational and appropriate." *Id*. at 8.

The court then affirmed the lower court's determination that the applicant was not mentally retarded. In doing so, the court relied in part on the lay testimony of Texas Department of Criminal Justice officers regarding the applicant's behavior while in jail. *Id*. at 18 ("In sum, we conclude that, while there is expert opinion testimony in this record that would support a finding of mental retardation, there is also ample evidence, including expert and lay opinion testimony, as well as written records, to support the trial court's finding . . . ."). If the Texas Court of Criminal Appeals was willing to ground its *Atkins* determination in part on the testimony of lay witnesses, it could not—as a pure matter of logic—have tacitly adopted the standard in § 591.003(16) as a litmus test for qualification to opine on an applicant's mental condition.[1]

The purpose of the PMRA is to provide social services to and guarantee rights of persons with mental retardation. § 591.002. The PMRA, by its own terms, is irrelevant to the application of *Atkins*. For Eighth Amendment purposes, it neither defines mental retardation nor—more relevantly—establishes who may diagnose mental retardation. Laying aside whether, or how much, Texas may, in implementing *Atkins*, restrict expert testimony according to the standards of subsection

---

[1] Further evidence that the *Briseno* court did not adopt subsection (16)'s standard is that it referred broadly to who may assess mental retardation: "Psychologists *and other mental health professionals* are flexible in their assessment of mental retardation." *Id*. at 7 n.24 (emphasis added).

5

(16) of the PMRA or other standards, there is no indication that it has done so. Reliance on subsection (16) of the PMRA to exclude Dr. Patton's testimony is therefore misplaced.[2] This Court relies on Dr. Patton's report for the limited purpose of assessing whether Hearn has made a *prima facie* case of mental retardation—that is, whether he has raised questions of possible merit which justify further exploration below.[3]

Texas further argues that Dr. Patton's opinion on adaptive functioning improperly relies upon the Adaptive Behavior Assessment System–Second Edition ("ABAS-II"). Hearn responds that Dr. Patton correctly used and relied upon the ABAS-II in making his determination. We will not address this factual dispute over Dr. Patton's methods and findings. We hold only that Hearn, through Dr. Patton's report and its incorporation of the reports of Dr. Stewart and Dr. Conroy, has put forth minimally sufficient evidence to make a *prima facie* case that he may be a person with mental retardation.

---

[2] Hearn characterizes subsection (16)'s standard for persons qualified to diagnose mental retardation as "myopic" because it allows only Texas licensed or certified physicians or psychologists to diagnose mental retardation. We take no position on the merit of this standard; we merely determine that it has not been made applicable in *Atkins* proceedings.

[3] We note that Dr. Patton has offered his opinion on a defendant's mental retardation in a similar case. *See Morris v. Dretke*, No. 04-70004, 2005 U.S. App. LEXIS 11430, at *11–12 (5th Cir. June 16, 2005). Texas argued in *Morris* that Dr. Patton was an "unlicensed psychologist." *See* Texas's Response in Opposition to Application for Certificate of Appealability at 7. The district court, ruling on Texas's motions to dismiss Morris's amended petition for habeas corpus, did not determine whether Morris had made a sufficient showing of mental retardation or whether it could consider Dr. Patton's testimony. Rather, it dismissed the petition without prejudice on exhaustion grounds. *Morris v. Dretke*, No. H-03-2186 (S.D. Tex. filed Dec. 5, 2003). The district court did note, however, that Morris's amended petition, which included Dr. Patton's affidavits opining that Morris was mentally retarded, was a "much stronger *Atkins* claim than he presented to the Texas courts." *Id.* at *17. This Court agreed that Morris's evidence, which included Dr. Patton's affidavits, was "professional assessment evidence" which "factually bolstered" Morris's *Atkins* claim. 2005 U.S. App. LEXIS 11430, at *30–31.

In accordance with the Supreme Court's mandate in *Atkins*, because there is sufficient, albeit slight,[4] merit in Hearn's motion to warrant further exploration by the district court, it is hereby ORDERED that Hearn's motion for permission to file a successive petition for writ of habeas corpus is GRANTED.

---

[4] Dr. Patton's report shows that Hearn barely meets the standard for significant limitations in intellectual functioning. On the AAMR's definition of mental retardation, significant limitations in intellectual functioning amount to performance on an appropriate assessment instrument that is approximately two standard deviations below the mean, taking into account the instrument's standard measurement error. On the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), two standard deviations below the mean would amount to a score of 70. The measurement of error is approximately 5 points, so that a score of 70 represents a range of 65–75. On the WAIS-III administered by Dr. Conroy, Hearn obtained a Full Scale IQ of 74, a Verbal IQ of 73, and Performance IQ of 78. Dr. Patton, taking into account the measurement error for the WAIS-III, concludes that Hearn's scores "are in the IQ range that can be considered *approximately* two standard deviations below the mean of 100."

JERRY E. SMITH, Circuit Judge, dissenting:

I.

Largely for the reasons I expressed in dissenting from the opinion appointing counsel and staying execution, *see In re Hearn*, 376 F.3d 447, 459-71 (5th Cir. 2004) (Smith, J., dissenting), I continue to disagree with the panel majority's handling of this matter, which has been prolonged by misapplication of the standards set by Congress and the applicable caselaw.[5] This is a desperate attempt to salvage something from nothing, to manufacture an eleventh-hour claim of retardation to stave off execution. Every member of this panel (any protestations to the contrary) surely knows well that Hearn is not retarded, and the district court eventually will so find, yet this minuet is played again and again to satisfy fanciful notions of procedural nicety.[6]

In its most recent stanza, the song includes Hearn's obvious inability to find an expert qualified under state law anywhere in the State of Texas who is willing to say that he is retarded. Two

---

[5] See especially the summary of Hearn's flimsy evidence, summarized in part II.B.1 and 2 of the dissent at 376 F.3d at 467-70 (Smith, J., dissenting).

[6] When I refer to "fanciful notions of procedural nicety," I do not mean to make light of this matter, which is of the most serious nature given that a life hangs in the balance. Indeed, we must diligently follow the requirements laid down by the Supreme Court and this court to assure Hearn his constitutional rights. But the panel majority, too, must remember that there are indeed death row inmates who are actually retarded and therefore not lawfully subject to the penalty of death, whose cases deserve our most serious attention. By expending excess resourcesSSstate and federalSSon Hearn's frivolous claim, this court, albeit with the best intention, disserves those petitioners and muddies the standards that we must apply as the Supreme Court has directed.

of the three "experts" he presents (after ample time and funds to find them) indeed appear to be qualified under Texas law, but both decline to opine that Hearn is retarded. The panel majority evades this barrier by a bizarre parsing of state law and of state and federal caselaw, to find a way to allow Hearn's third but unauthorized expert, Professor Patton, to testify.

## II.

We are faced today with the same quandry discussed in *In re Morris*, 328 F.3d 740 (5th Cir. 2003) (per curiam). There, in addressing another request to file a successive habeas corpus petition, this court discussed the conflicting evidence; one judge acknowledged that he was "confessedly dubitante" on whether there was "enough merit to warrant further exploration by the district court." *Id.* at 741 (Higginbotham, J., concurring). To the extent we are "dubitante" here, we should follow the lead of the panel that issued binding Fifth Circuit authority in *In re Johnson*, 334 F.3d 404 (5th Cir. 2003) (per curiam). In evaluating a request to file a successive habeas petition on an *Atkins* claim, the *Johnson* panel was faced with facts strikingly similar to those presented by Hearn. Much like Hearn, petitioner Johnson presented equivocal letters from a psychologist expressing the belief that his verbal intelligence level might be as low as 62-65. Johnson presented a seventh grade transcript showing failure in all his academic

9

courses.  The panel decided that "the two letters and seventh grade transcript offered by Johnson are simply insufficient to suggest that further development of his claim has any likelihood of success under the *Atkins* criteria."  *Id.*

### III.

Hearn (and perhaps the panel majority) of course would counter that Hearn has presented the opinion of an "expert" who says he is retarded, and that that important evidence distinguishes this case from *Johnson*.  But that could not possibly be so unless Hearn's new affiant is qualified to speak to mental retardation under Texas law.  It is at this point that the panel majority most seriously misses the mark.

### A.

Hearn relies almost exclusively on the assessment of a witness, Professor Patton, who has an "Ed.D." degree and who is self-described as "an educational consultant and author in the field of special education and disabilities" and has "served as a mental retardation specialist."[7]  One of the many problems with Hearn's proffer, however, is that Texas law provides that mental retarda-

_____

[7] I do not mean in any way to criticize Professor Patton's work or to make fun of his credentials as a person with considerable experience (including writing and teaching) as an educational consultant and respected professor at a leading university.  The question is whether he is qualified under Texas law to opine as to Hearn's claim of mental retardation.  That is fair game, and no personal attack on Patton is intended.

tion may only be "determined by a physician or psychologist licensed in this state or certified by" the Texas Department of Mental Health and Mental Retardation to make a determination of retardation. That is the specific requirement of section 591.003(16) of the Texas Health and Safety Code. It is undisputed that Patton is neither a physician nor a psychologist, in Texas or elsewhere.

B.

The panel majority's excuse for considering Patton's opinion is that "the Texas Health and Safety Code's standard for those who may determine mental retardation . . . has not been made applicable to *Atkins* proceedings." This reasoning is so shabby as to seem contrived, though I am sure that, instead, it is presented in good faith.

Both parties in this case, and all three judges on this panel, agree that Texas has not yet formally adopted procedures for handling claims of mental retardation in the wake of *Atkins*. This vacuum has been dealt with successfully, however, by the Texas courts. Recently in *In re Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), Texas's highest criminal court recounted that in *Atkins* the Supreme Court "left to the individual states the substantive and procedural mechanisms to implement that decision." *Id.* at 5. "The Texas Legislature has not yet enacted legislation to carry out the

11

*Atkins* mandate. *Id.* Accordingly, the Court of Criminal Appeals recognized that it "must act to provide the bench and bar with temporary judicial guidelines in addressing *Atkins* claims." *Id.* (footnote omitted).

The Court of Criminal Appeals then proceeded to "set out . . . judicial standards for courts considering [*Atkins*] claims. *Id.* It noted that the Texas Legislature had passed, but the governor had vetoed, legislation prohibiting execution of the mentally retarded that adopted the definition of mental retardation contained in § 591.003(13) of the Health and Safety Code. The Court of Criminal Appeals also observed that it previously had employed the definition from § 591.003(13). *Id.* (citing *Ex parte Tennard*, 960 S.W.2d 57, 60-61 (Tex. Crim. App. 1997)). The court reasonably concluded that "[u]ntil the Texas Legislature provides an alternate statutory definition of 'mental retardation' for use in capital sentencing, we will follow the [American Association on Mental Retardation] or section 591.003(13) criteria in addressing *Atkins* mental retardation claims." *Id.* at 8. Only a few days ago, this court recognized that indeed in *Briseno* the Court of Criminal Appeals has "adopted . . . the Texas Health and Safety Code section 591.003(13) . . . as an alternative standard for a petitioner to show his mental retardation." *Morris v. Dretke*, No. 04-70004, 2005 U.S. App. LEXIS 11430, at *37 (5th Cir. June 16, 2005).

12

C.

It follows logically that if the State of Texas, through its highest criminal court, has decided to use its statutory definition of "mental retardation" in *Atkins* proceedings, it would be a "no brainer" that the statutory definition of who is qualified to opine as to mental retardation would also apply. In fact, reaching a contrary conclusion is unreasonable: to assume that the legislature or Court of Criminal Appeals would apply the one provision but not the other.

An examination of the two subsections of section 591.003 reveals why this is so. Subsection (13), which the panel majority blesses in today's missive, states that "Mental retardation" means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the development period." Subsection (16) of the same statute, which the panel majority dismisses as not properly ensconced as a Texas *Atkins* standard, reads, almost identically, as follows: "Person with mental retardation" means a person determined by a physician or psychologist licensed in this state or certified by the department to have subaverage general intellectual functioning with deficits in adaptive behavior."

In fact, it is difficult to imagine how "mental retardation" under subsection (13) can be determined accurately without some sort of standard for how its various components ("subaverage

13

general intelligence," etc.) can be identified in a particular person. The legislature wisely added the requirement of physician or psychologist to ensure that the definition itself has meaning and is not subject to the "opinion" of any lay witness  that a particular person appears "dumb" or "smart."  In this very real sense, the limitation on who can opine as to retardation is an integral part of the definition of the term.

It is our duty to determine, as best we can during this "legislative interregnum," *Briseno*, 135 S.W.3d at 5, what the Court of Criminal Appeals would do with subsection 16.  It is  non-sensical to suggest that the legislature or Court of Criminal Appeals, if faced with the question, would utilize subsection 13 without subsection 16.  Yet, that is precisely what the panel majority has done, using only the wimpy notion that subsection (16) "is not mentioned in *Briseno*."  Of course, the obvious reason subsection (16) is not mentioned there is that it apparently was not an issue there, as it most certainly is here.

### D.

Perhaps the most profound statement in the panel majority's opinion is the following:  "Nothing in *Briseno* supports the proposition that Dr. Patton is unqualified to opine whether Hearn is mentally retarded for purposes of an *Atkins* claim; indeed, *Briseno* relied upon lay opinion to determine retardation" (citing *Briseno*,

14

135 S.W.3d at 18). The lay opinion on which *Briseno* relied consisted of prison officers who testified that the prisoner's "behavior seemed 'normal' and 'appropriate' in prison." *Id.* A deputy sheriff testified that petitioner was "'intelligent, shrewd, and very cunning.'" *Id.* These obviously were fact witnesses who testified as to their day-to-day encounters with the petitioner.

Hearn, on the other hand, proffers Patton as an "expert" in the field of mental retardation. The panel majority here is saying that even if Patton is unqualified under Texas law to testify as an expert, he can state his "opinions" as a lay witness. This runs directly contrary to Rule 701 of the Federal Rules of Evidence, which reads as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) *not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702.*

(Emphasis added.)

If the panel majority's statement holds true, the reasonable restrictions of rule 703 are entirely eviscerated. A petitioner (or, for that matter, the state) can present any "expert" to opine as to mental retardation, and if that person's qualifications or testimony fails as a matter of law to constitute admissible expert testimony, his testimony nevertheless (and at the whim of any

15

judge) can be received and considered as "lay" testimony.[8]  This is indeed frightening.

IV.

A.

Fortunately, the panel majority has placed the following restriction on the use of Hearn's witness's report:  The majority relies on it "for the limited purpose of assessing whether Hearn has made a *prima facie* case of mental retardationSSthat is, whether he has raised questions of possible merit which justify further exploration below."  By this statement, the district court is free to reject Patton's testimony, including for the reason that he is not qualified in Texas to opine as to mental retardation under § 591.003(16), unless, of course, the district court buys into the astonishing notion (discussed in the preceding paragraph) that Patton can testify here as a lay witness.

---

[8] Despite the panel majority's undocumented theory, Patton does not qualify as a "lay witness," either.  His proffered testimony is based not on day-to-day, lay encounters with Hearn, but entirely on the following (as stated in his report):

> I have reviewed the materials sent to me from Naomi Terr and Richard Burr, pertaining to their client, Yokamon Hearn.  This information includes records of Mr. Hearn's academic, behavioral, personal background and the assessment results generated by Dr. Mary Alice Conroy from her evaluation conducted on 10 May 2005.  I interviewed Mr. Hearn at the Polunsky Unit in Livingston, Texas, on 06 May, 2005.  In addition, I interviewed his mother, five of his cousins, and a former teacher on 09-10 May 2005.  Lastly, I conducted a formal adaptive behavior assessment with one of Mr. Hearn's cousins on 15 May 2005.  I performed all of these activities to determine whether or not Mr. Hearn met the criteria for mental retardation as indicated by the 2002 definition of the American Association on Mental Retardation.

B.

In this regard, I remind the district court that, on remand, it is fully authorizedSSindeed, charged with the responsibilitySSto serve as a "second 'gate' through which the petitioner must pass before the merits of his or her motion are heard."[9]  Thus, this court has "borrowed from the Seventh Circuit" the "'tentative' process" for considering an application for permission to file a successive habeas petition.  *In re Morris*, 328 F.3d at 741 (Higginbotham, J., concurring).

Under this process, the district court is bound to use the following methodology:  "[A] petitioner 'must get through two gates before the merits of the motion can be considered.'"  *Reyes-Requena*, 243 F.3d at 899 (quoting *Bennett*, 119 F.3d at 470).  This is so because a court of appeals uses the *prima facie* test, making "rulings on such applications under tight deadlines and with limited information."  *Id.* (citing *Bennett*, 119 F.3d at 469).  Stated another way, the duty of the district court is as follows:

> Therefore, the "grant [by a court of appeals to file a second or successive motion] is, . . . it is important to note, tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion." [*Bennett*, 119 F.3d] at 470.  The district court then is the second "gate" through which the petitioner

---

[9] *In re Morris*, 328 F.3d at 741 (quoting *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (King, C.J.) (quoting *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997), and citing 28 U.S.C. § 2244(b)(4))).

17

must pass before the merits of his or her motion are heard.

. . . [T]he district court must conduct a "thorough" review to determine if the motion "conclusively" demonstrates that it does not meet AEDPA's second or successive motion requirements [citation omitted].

*Reyes-Requena*, 243 F.3d at 899 (some brackets and ellipses in original).

V.

In summary, I dissent because the panel majority has failed properly to apply the AEDPA standard for determining whether a *prima facie* case has been made. In its otherwise flawed opinion issued almost a year ago, the panel majority accurately opined that the evidence Hearn had presented (which included an affidavit from Patton) was "certainly insufficient to establish a *prima facie* case of mental retardation." *In re Hearn*, 376 F.3d 447, 455. In the intervening time, nothing of substance has been added to Hearn's "certainly insufficient" proffer. If anything, his presentation has gone backward, for even with sufficient financial and temporal resources he has presented only the brief reports of two experts who are unable to say he is retarded, and the more detailed report of a third person who is unqualified as a matter of Texas law to opine on Hearn's mental abilities.[10]

_____

[10] The special concurrence made a similar evaluation last year: "What little 'evidence' that has been presented is equivocal and needs explanation. If the record before us is all that Hearn

(continued...)

18

Yet, the panel majority seems intent, once again, on extending this matter to yet another verse, to give Hearn "just one more chance" to establish mental retardation in the face of a showing that the majority admits is "slight." I fully understand and respect the panel majority's diligence in making sure there is no substance to Hearn's new-found claim of disability. I only protest that even in light of that sensitivity, it is our duty, as keepers of the first "gate," to call a halt and say "enough is enough" when faced with a claim that plainly fails to make a *prima facie* case under the requirements of AEDPA.[11] Accordingly, I respectfully dissent and place it into the hands of the district court to set

---

[10](...continued)
can produce before the district court with the assistance of a lawyer, I would quickly agree that it falls far short of a prima facie showing." *In re Hearn*, 376 F.3d at 458 (Higginbotham, J., concurring). No new admissible evidence that is substantial has been proffered.

[11] Predictably the panel majority might respond that it is the chore of the district court, and not this court, to do the final weighing in deciding whether a proper case is presented. We should follow the lead of the panel in *Johnson*, which, in deciding that no *prima facie* case had been established, carefully reviewed the petitioner's presentation and opined that it was "insufficient to suggest that further development of his claim has any likelihood of success under the *Atkins* criteria." *Johnson*, 334 F.3d at 404.

In reviewing again what was written last year by the various members of this panel, I now question whether there was ever much attention to this court's role as the first gatekeeper. In other words, it may be that the panel majority always anticipated that leave would be granted to file a successive habeas petition so that the district court could evaluate the facts in the first instance. For example, the concurring judge reasoned as follows: "If there is nothing there, as the dissent seems to know, the district court will so conclude. In the end I have more confidence in facts decided by an Article III trial judge with competent counsel before him than those determined on appeal by appellate judges." *In re Hearn*, 376 F.3d at 459 (Higginbotham, J., concurring). This approach flies in the face of *Johnson* and seems to suggest that this court's role as the first gatekeeper is minimal, at best.

this matter straight.